# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

SUSAN BUFORD,

      Plaintiff,

v.                                   Case No.  3:20-cv-703-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision regarding her application for a period of disability and disability insurance benefits ("DIB").  Following an administrative hearing held on September 4, 2014, the assigned Administrative Law Judge ("ALJ") issued a decision on November 18, 2014, finding Plaintiff not disabled from August 11, 2008, the alleged disability onset date, through December 31, 2013, the date last insured.[2]  (Tr. 41-50, 55-91.)  On March 17, 2016, the

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Docs. 20 & 21.)

[2] Plaintiff had to establish disability on or before December 31, 2013, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 704.)

Appeals Council denied Plaintiff's request for review of the ALJ's November 18, 2014 decision.  (Tr. 1-4.)

Thereafter, Plaintiff filed a federal civil complaint in the U.S. District Court for the Northern District of Florida.  (Tr. 792-94.)  On December 12, 2017, the district court reversed the decision of the ALJ and remanded the case to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.[3]  (*See* Tr. 825-26 (order adopting U.S. magistrate judge's report and recommendation, reversing the decision of the ALJ, and remanding the matter to the Commissioner); *see also* Tr. 796-824 (report and recommendation).)  On May 21, 2018, the Appeals Council vacated the ALJ's November 18, 2014 decision and remanded the case to an ALJ "for further proceedings consistent with the order of the court."  (Tr. 833.)

On May 8, 2019, the new ALJ held another hearing and, on July 17, 2019, issued a partially favorable decision finding Plaintiff was not disabled prior to April 1, 2013, but that she became disabled on that date and

---

[3] The Court found that the ALJ "erred in failing to properly evaluate and assign appropriate weight to the opinions of Plaintiff's treating physician," Rajiv Puri, M.D., an orthopedic surgeon.  (Tr. 802, 823.)  The Court also found that "[a]s a result of this error and the fact that the ALJ instead determined that Plaintiff [was] far less limited than Dr. Puri opined, the ALJ should be required to reassess Plaintiff's RFC, properly taking into account the opinion of Plaintiff's treating physician, and then at step four of the sequential evaluation [determine] whether Plaintiff is capable of performing her past relevant work."  (Tr. 823.)

continued to be disabled through the date of the decision.  (Tr. 704-15, 725-61.)  Plaintiff appealed only the unfavorable portion of the ALJ's decision finding Plaintiff was not disabled from August 11, 2008, the alleged disability onset date, through March 31, 2013.  (Tr. 969-72.)   On April 30, 2020, the Appeals Council declined to assume jurisdiction over Plaintiff's request for review of the ALJ's July 17, 2019 decision.  (Tr. 682-85.)

Plaintiff is now appealing the Commissioner's final decision that she was not disabled from August 11, 2008 through March 31, 2013.  Plaintiff has exhausted her available administrative remedies and the case is properly before the Court.  (*See* Tr. 683.)  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

## I.    Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.  Discussion

Plaintiff raises two issues on appeal. (Doc. 25.) First, Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence, including the opinions of Plaintiff's treating orthopedist, Rajiv Puri, M.D., her treating physician, Richard Yu, M.D., and examining orthopedist, Ralph N. Steiger, M.D. (*Id.* at 20-29.) Specifically, Plaintiff contends that the ALJ's conclusion that the opinions from Dr. Puri, Dr. Yu, and Dr. Steiger "are not supported by objective evidence prior to April 2013 is directly contradicted by the treatment record." (*Id.* at 22-23.) "Rather than give any probative weight to the opinions from treating physicians, Drs. Puri and Yu, or examining specialist Dr. Steiger," Plaintiff argues that "the ALJ relied primarily on the

4

opinions from non-examining state agency medical consultants (Tr. 712)."
(Doc. 25 at 26.)  Plaintiff further argues that while the ALJ accorded some
weight to the opinions of consultative examiner, Payam Moazzaz, M.D., his
opinion from April 14, 2013 post-dated "the current period at issue without
any indication that the assessment found for [sic] Plaintiff was retrospective
in nature," and, thus, "the report from this doctor does not relate to the
period of time relevant to the current appeal."  (*Id.* at 27.)  "In contrast to the
opinions from the Administration's consultants," Plaintiff contends, "the
opinions from treating physicians, Dr. Puri and Dr. Yu, are based on
appropriate objective imaging both before and after Plaintiff's surgery and
clinical evaluations documented over long periods of treatment."  (*Id.* at 28.)
Plaintiff argues that the "opinions from the treating doctors should have been
given controlling weight pursuant to 20 C.F.R. § 404.1527(c)(2) . . . ."  (*Id.*)

Second, Plaintiff claims that the ALJ failed to properly evaluate her
testimony, including her subjective statements and that the ALJ's evaluation
of Plaintiff's statements is not supported by substantial evidence.  (*Id.* at 29-
31.)  Plaintiff contends that the ALJ "simply relied on the same flawed
reasoning used to weigh the medical opinion evidence by focusing again on (1)
a perceived lack of objective medical evidence of disability; (2) the course of
treatment; and (3) Ms. Buford's limited activities of daily living."  (*Id.* at 31.)
Plaintiff also maintains that the ALJ should have considered her "honorable

work history with sustained earnings every year for 20 years prior to the onset of her disability." (*Id.* at 32.)  Based on the foregoing, Plaintiff "requests that the decision of the Commissioner be reversed for an award of benefits for the period at issue from August 11, 2008 through Mach 31, 2013."[4]  (*Id.* at 33.)

Defendant, on the other hand, argues that substantial evidence supports the ALJ's finding that Plaintiff was not disabled prior to April 2013.[5]  (Doc. 26.)  As to Plaintiff's first argument, Defendant counters that the ALJ properly weighed the medical source opinions.  (*Id.* at 5-13.)  Specifically, Defendant argues that "[t]he ALJ's finding does nor run afoul of the Northern District of Florida's prior decision to remand this matter for

---

[4] Plaintiff also adds:
All the relevant treating and examining medical sources agree that Ms. Buford is disabled during this period of time and the ALJ failed to credit any credible testimony to the contrary.  Plaintiff first applied for benefits more than eight-and-a-half years ago.  Her case has already been remanded by the District Court once already and the Commissioner failed to abide by the specific findings in that Court order.  It is highly unlikely that any further evidence relevant to the remote period in time at issue could be developed now.  There are approximately 720,000 individuals waiting for a hearing . . . .  To make Ms. Buford wait another year or more for another ALJ decision when all the credible evidence points in one direction would be inappropriate.
(*Id.* at 33.)

[5] According to Defendant, the material period at issue here is short, from "approximately July 2011 (the earliest date from which Plaintiff might receive back paid DIB benefits) to April 2013, the month as of which the ALJ already found Plaintiff disabled." (Doc. 26 at 1.)

additional considerations of Dr. Puri's opinions" because the ALJ did not issue a partially favorable decision then, but rather "found Plaintiff not disabled through the date of his decision, November, 18, 2014." (*Id.* at 10.) "The court's decision to remand was thus based in part on evidence that Plaintiff's condition deteriorated beginning in 2013, which the prior ALJ, unlike the new ALJ, failed to recognize (Tr. 819)." (Doc. 26 at 10.)  Second, Defendant maintains that substantial evidence supports the ALJ's decision to discount Plaintiff's subjective complaints. (*Id.* at 13-17.)  The Court agrees with Plaintiff on the second issue; therefore, the remaining issue is not addressed in detail.

### A.  Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not

bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)-(6).  "However, the ALJ is not required to explicitly address each of those factors.  Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam), 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding."

*Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971,

*2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d

834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state

agency medical and psychological consultants because they 'are highly

qualified physicians and psychologists, who are also experts in Social

Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948

(11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must

treat the findings of State agency medical consultants as expert opinion

evidence of non-examining sources).  While the ALJ is not bound by the

findings of non-examining physicians, the ALJ may not ignore these opinions

and must explain the weight given to them in his decision.  SSR 96-6p.

When a claimant seeks to establish disability through her own

testimony of pain or other subjective symptoms, the Eleventh Circuit's three-

part "pain standard" applies.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.

1991) (per curiam).  "If the ALJ decides not to credit such testimony, he must

articulate explicit and adequate reasons for doing so." *Id*.

> The pain standard requires (1) evidence of an underlying medical
> condition and either (2) objective medical evidence that confirms
> the severity of the alleged pain arising from that condition or (3)
> that the objectively determined medical condition is of such a
> severity that it can be reasonably expected to give rise to the
> alleged pain.

*Id.*

Once a claimant establishes that his pain is disabling through objective medical evidence from an acceptable medical source that shows a medical impairment that could reasonably be expected to produce the pain or other symptoms, pursuant to 20 C.F.R. § 404.1529(a), "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability," *Foote*, 67 F.3d at 1561.  *See also* SSR 16-3p[6] (stating that after the ALJ finds a medically determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the individual's symptoms" to determine "the extent to which an individual's symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record. . . .

---

[6] SSR 16-3p rescinded and superseded SSR 96-7p, eliminating the use of the term "credibility," and clarifying that "subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p.

In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[7]  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

. . .

In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation.  The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person.  Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities[.]

SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms

and to follow treatment once it is prescribed" will also be considered "when

---

[7] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;

- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

## B.   Relevant Evidence of Record

### 1. Richard Yu, M.D./Kaiser Permanente Medical Center

On August 14, 2008, Dr. Yu evaluated Plaintiff after she suffered injuries from a fall at work on August 11, 2008.  (Tr. 424.)  Plaintiff reported pain in her neck, shoulders, left upper and lower back, and left leg, vertigo, and shortness of breath when lying on the left side or on her chest.  (*Id.*)  She reported her pain level was 8/10.  (*Id.*)  Physical examination revealed tenderness to palpitation in the posterior and lateral neck, left thoracic and lumbar back, and superior and posterior shoulders, as well as a spasm in the neck.  (Tr. 425.)  X-rays of the lumbosacral spine revealed "[d]egenerative disc space narrowing with vacuum phenomenon . . . at the lumbosacral junction" as well as "mild hypertrophic changes in the facet joints at that level."  (Tr. 427-28.)  Dr. Yu diagnosed Plaintiff with injury of the neck, whiplash; bilateral shoulder strain; back strain, thoracic-lumbar-sacral; intermittent and moderate lumbosacral radiculitis on the left side; and a concussion with vertigo.  (Tr. 426.)

On September 2, 2008, Plaintiff returned to Dr. Yu and a physical examination revealed similar findings as the previous visit. (Tr. 434.) Plaintiff reported her pain level as 8/10 and her listed medications included ibuprofen, cyclobenzaprine, and over-the-counter Tylenol. (Tr. 435.) Dr. Yu also noted Plaintiff had pain in her left hip, but X-rays revealed no significant abnormality. (Tr. 436-38.) On September 16, 2008, Plaintiff's reported similar symptoms, including a pain level of 9/10, and Dr. Yu made similar observations and findings as during the previous visit. (Tr. 443-44.) On October 7, 2008, Plaintiff returned to Dr. Yu and continued to complain of pain in the neck, shoulders, left upper and lower back, sharp pain down her left leg, and a pain level of 9/10. (Tr. 452.) She also reported swelling in her left foot, intermittent vertigo and associated blurred vision, and tinnitus associated with head movement. (*Id.*) On physical examination, Plaintiff exhibited tenderness to palpitation in the posterior and lateral neck, left thoracic and lumbar back, and superior and posterior shoulders, a spasm in the neck, and dorsal tenderness in the left foot. (*Id.*) Dr. Yu added sprain of the left foot as a diagnosis. (Tr. 454.) Dr. Yu postponed physical therapy because Plaintiff's symptoms were still too painful and she was too disabled. (*Id.*)

On October 14, 2008, Plaintiff presented to Dr. Yu with unchanged complaints, including a reported pain level of 9/10. (Tr. 460.) Dr. Yu made

similar findings on physical examination and referred Plaintiff to physical therapy. (Tr. 460-62.) On November 4, 2008, Plaintiff was evaluated by Matt Jason Brown, P.T. (Tr. 467-68.) Plaintiff reported, *inter alia*, pain in the bilateral lower neck, bilateral upper scapular regions, bilateral posterior lower back and central low back; pain in the anterior/posterior left hip, thigh, and from the knee to the foot; and swelling in the left foot related to intensity of pain involved during the day. (Tr. 468.) Plaintiff reported her pain level was 7/10 with activity and described her pain as burning. (*Id.*) Aggravating factors included sitting for 10 minutes and walking for 10-15 minutes; easing factors included changing position, the use of a contour pillow for her neck, lying on the right side with the left leg supported, stretching, and medications. (*Id.*) Her symptoms were worse at night. (*Id.*)

On physical examination, Mr. Brown noted precautions were indicated due to Plaintiff's sensitivity to pain and changes in position. (*Id.*) He also noted, *inter alia*, decreased lordosis and increased kyphosis; her gait exhibited a wide base of support and avoidance of weightbearing on the left lower extremity; trunk flexion and extension were limited on both sides due to pain; and side bending on the left was 50 cm with a locking sensation on the left. (*Id.*) Physical examination also elicited tenderness to palpitation in the posterior superior iliac spine ("PSIS") and in the bilateral short and long ligaments, greater on the left. (*Id.*) Mr. Brown also noted Plaintiff had a

positive straight leg raise test on the right with pain in the lower back at ten degrees, pain elicited with straight leg raise test on the left, and pain in the shoulders with neck flexion.  (*Id.*)  Mr. Brown further noted that Plaintiff was unable to sit for more than ten minutes without pain, requiring a change of position for relief and "yielding patient unable to return to work."  (Tr. 470.)

On November 5, 2008, Plaintiff returned to Dr. Yu complaining of pain in the neck, shoulders, left upper and lower back, sharp pain down the left leg, swelling in the left foot, intermittent vertigo with head movements, and worsening left hip pain with ambulation, severe after short distances, as well as left shoulder pain with reaching above shoulder-level.  (Tr. 475.)  Plaintiff exhibited limited range of motion in the lumbar back, with extension limited to 10 degrees and flexion limited to 50 degrees.  (*Id.*)  Her left shoulder also exhibited tenderness to palpitation, a positive supraspinatus sign, and a positive Hawkins test.  (Tr. 476.)  Physical exam also revealed lateral and inguinal pain in the left hip and dorsal tenderness in the left foot.  (*Id.*)  Dr. Yu observed Plaintiff's gait was "normal for maybe 2-3 seconds" but then became slow and antalgic due to pain.  (*Id.*)  Dr. Yu noted that Plaintiff was not improving with conservative treatment and ordered MRIs.  (Tr. 477.)  Plaintiff also followed up with Dr. Yu on November 20, 2008 with similar complaints, including a reported pain level of 9/10.  (Tr. 494-95.)  Dr. Yu

made similar findings on physical examination and again noted that Plaintiff was not improving with conservative treatment. (Tr. 497.)

An MRI of the lumbar spine dated December 1, 2008 revealed mild bilateral hypertrophy at L4-5 and L5-S1, slightly worse on the left side at the level of L5-S1, and no evidence of disc herniation or spinal canal stenosis. (Tr. 391-92.)  An MRI of the left shoulder, also dated December 1, 2008, revealed a partial tear of the supraspinatus tendon in the left shoulder.  (Tr. 534.)

On December 9, 2008, Dr. Yu noted Plaintiff's reported pain level was 7/10.  (Tr. 516.)  Plaintiff reported the swelling in her left foot was improving as she elevated her leg a lot.  (*Id.*)  Plaintiff reported that physical therapy had not helped with her symptoms.  (*Id.*)  A review of systems ("ROS") revealed vertigo, shortness of breath lying on the left side/on the chest, and radicular pain down the left leg in the S1 distribution.  (*Id.*)  The range of motion in Plaintiff's back was limited to 10 degrees on flexion and 45 degrees on extension, she had a positive straight leg raise test, and ambulated with a mild antalgic gait.  (Tr. 516-17.)  Dr. Yu noted that Plaintiff would stop physical therapy and that she was not improving with conservative

treatment.[8]  (Tr. 518.)  He opined that Plaintiff could not tolerate prolonged driving or sitting and was to continue with work restrictions.  (*Id*.)

On December 23, 2008, Dr. Yu noted Plaintiff's reported pain level was 10/10.  (Tr. 524.)  Physical findings and observations were similar to the previous visit, including a positive straight leg raise test, radicular pain down the left leg in the S1 distribution, and an observed mild antalgic gait.  (*Id*.) Dr. Yu also noted that the December 1, 2008 MRI of the left shoulder revealed a partial tear of the supraspinatus tendon and he referred Plaintiff to an orthopedist.  (Tr. 525-26.)  He also noted that due to persistent radicular pain, Plaintiff would also need NCS/EMG testing.  (Tr. 526.)  He again opined that Plaintiff could not tolerate prolonged driving or sitting. (*Id*.)

On January 13, 2009, Plaintiff presented to Dr. Yu with a pain level of 10/10 and stated that the physical therapy had not helped her symptoms. (Tr. 532.)  An ROS and physical exam revealed similar findings and observations as the previous visit.  (Tr. 532-34.)  Dr. Yu stopped Plaintiff's physical therapy and again noted she was not improving with conservative

---

[8] Physical therapy notes dated December 9, 2008 also state that Plaintiff missed her previous session because she was too sore from her MRIs, which was caused by Plaintiff remaining in the same position for too long.  (Tr. 509.)  Upon discharge from therapy, Mr. Brown noted that she had not reached her functional goals, there was no improvement, she had reached a plateau, and had not complied with treatment.  (Tr. 510.)

treatment.  (Tr. 534.)  He also noted that the results of the NCS/EMG test were pending.  (*Id.*)  Plaintiff stated she was interested in finding an orthopedic doctor near her home.  (*Id.*)

### 2. Dr. Rajiv Puri/Puri Orthopedic Center

On February 4, 2009, Dr. Puri evaluated Plaintiff and completed a Doctor's First Report of Occupational Injury or Illness.  (Tr. 383.)  Dr. Puri noted Plaintiff sustained multiple injuries to the left side of her body after falling at work.  (*Id.*)  Dr. Puri made the following findings: tender cervical spine with radicular pain down the left arm; an MRI showed a rotator cuff tear; an X-ray of the cervical spine showed degenerative disc disease; the lumbosacral spine had degenerative disc disease at L5-S1; tenderness in the left shoulder; and tenderness in the lumbosacral spine with left leg pain. (*Id.*)  Dr. Puri's diagnoses included: displacement of a cervical intervertebral disc without myelopathy; torn left rotator cuff; and displacement of a lumbar intervertebral disc without myelopathy.  (*Id.*)  Dr. Puri found Plaintiff could not perform her usual work and was to follow-up in three weeks.  (*Id.*)

Plaintiff presented to Dr. Puri at least once per month in 2009.  (Tr. 362-81.)  During this treatment period, Plaintiff consistently presented with complaints of severe pain in the left shoulder with pain radiating to the left side of her neck and down her left arm, and severe and persistent low back pain with radiation down the left leg, and Dr. Puri consistently found that

19

Plaintiff was not able to work.  (*See, e.g.*, Tr. 374, 377, 379, 381.)  On March 2, 2009, Dr. Puri observed Plaintiff had limited range of motion in the left shoulder and cervical spine, diagnosed Plaintiff with displacement of cervical intervertebral disc without myelopathy and torn left rotator cuff, and noted MRIs of the cervical spine and left shoulder were pending.  (Tr. 381.)  On March 16, 2009, Dr. Puri stated an MRI showed partial tear of the left rotator cuff, and Plaintiff's treatment plan included cortisone injections, medication, and physical therapy.  (Tr. 379.)  On April 13, 2009, Dr. Puri noted that the cortisone injection to the left shoulder had not helped and found Plaintiff had limited range of motion in her left shoulder.  (Tr. 377.)  Dr. Puri noted that Plaintiff would need arthroscopic surgery in her left shoulder.  (*Id.*)

On May 27, 2009, Dr. Puri made the following findings: Plaintiff was not improving ("no better"); she had limited range of motion; X-rays of the lumbosacral spine showed collapsed disc space at L5-S1; a positive straight leg raise test on the left at 30 degrees; and a positive straight leg raise test on the right at 60 degrees.  (Tr. 374.)  Plaintiff's diagnoses included rotator cuff tear and degenerative disc disease ("DDD") at L5-S1.  (Id.)  Dr. Puri noted Plaintiff was waiting for a "QME evaluation" of her shoulder and an MRI of the lumbosacral spine, and noted Plaintiff was to remain off work (*see id.*) and that she was totally temporarily disabled until the next exam (*see* Tr. 373 (accompanying "Work Injury Status Report")).

On June 24 and July 27, 2009, Dr. Puri's objective finding were unchanged ("status quo"). (Tr. 372, 370.) On August 10, 2008, Dr. Puri again noted Plaintiff had limited range of motion in the left shoulder and, after reviewing the QME report, again recommended arthroscopic surgery for the left shoulder rotator cuff tear. (Tr. 368.) Dr. Puri noted Plaintiff was to remain "off work." (*Id.*) On September 21, 2009, Dr. Puri noted Plaintiff's condition remained unchanged and was waiting for shoulder surgery authorization. (Tr. 366.) On November 23, 2009, Dr. Puri diagnosed Plaintiff with impingement syndrome and left shoulder rotator cuff tear. (Tr. 364.) Dr. Puri noted that Plaintiff was to remain off work (*see id.*) and that she was totally temporarily disabled until the next exam (Tr. 363). On December 21, 2009, Dr. Puri noted that Plaintiff's condition remained unchanged and that the shoulder surgery had been approved. (Tr. 362.) Dr. Puri found Plaintiff was to remain off work. (*Id.*; *see also* Tr. 361.)

On January 19, 2010, Dr. Puri performed arthroscopic subacromial decompression (A&D) surgery on Plaintiff's left shoulder. (Tr. 289-90.) On February 1, 2010, Dr. Puri diagnosed Plaintiff with status/post left shoulder surgery and prescribed physical therapy. (Tr 360.) He also noted Plaintiff would follow up for evaluation of her lower back. (*Id.*) Dr. Puri opined Plaintiff was to remain off work and that she was totally temporarily disabled until the next exam. (*See id.*; Tr. 359.)

On March 1, 2010, Plaintiff presented to Dr. Puri and stated that her left shoulder was coming along with physical therapy but she still had severe lower back pain with worsening radiation to the left leg and numbness in the left foot.[9] (Tr. 352.)  Dr. Puri ordered repeat MRIs of the lumbosacral spine and found she was to remain off work.  (*Id.*)  On April 12, 2010, Dr. Puri made similar findings as at the previous visit.  (Tr. 345.)  On May 3, 2010, Dr. Puri found Plaintiff had tenderness in the lumbosacral spine, diminished range of motion, positive straight leg raise tests at 30 degrees on the left and at 60 degrees on the right.  (Tr. 343.)  He also noted X-rays showed collapsed disc space at L5-S1 and MRI results revealed DDD at L5-S1 with foraminal stenosis on the left side.  (*Id.*)  Dr. Puri diagnosed Plaintiff with DDD at L5-S1 with radiculopathy and status post A&D surgery of the left shoulder.  (*Id.*)  Plaintiff's treatment plan included medication, physical therapy for the left shoulder, and spinal fusion at L5-S1.  (*Id.*)  Dr. Puri indicated Plaintiff was to remain off work.  (*Id.*)

In a report dated May 3, 2010, Dr. Puri explained, in part, that Plaintiff required lumbar spine surgery as follows:

---

[9] During the physical therapy for her shoulder after the surgery, Plaintiff consistently reported severe pain in her lower back.  (*See, e.g.*, Tr. 329, 330, 331, 336, 346, 349, 351, 353, 354, 355; *but see* Tr. 348 (noting, on April 9, 2010, that Plaintiff reported her left shoulder was "feeling better . . . as well as her back"); Tr. 333 (noting, on May 26, 2010, that Plaintiff reported "her back [was] behaving").)

She still has severe pain in the lumbar spine with radiation of pain down the left leg causing numbness in the left foot and she has extreme difficulty in walking for any distance. She can walk only one-half block, then she has to sit down and rest before she walks again. She is also very limited in her activities of daily living, such as bending forward or doing any housework. She has had these symptoms for over two years and are not getting any better. She had had physical therapy and tried several medications, and she is not in favor of any injection in the back.

On examination of the lumbar spine, she had a marked limitation of motion. She had a positive root tension sign in the left lower extremity. SLR on the left side was only 30 degrees as compared to 70 degrees on the right side. She also had hypoactive reflexes on the left side, especially at the ankle. She also had decreased sensation in the S1 dermatome of the left foot.

MRI of the lumbar spine done recently did reveal evidence of marked degeneration and marked collapse of the disc space at L5-S1 causing severe foraminal stenosis on the left side.

Diagnoses: [DDD] with a collapse at L5-S1 with severe foraminal stenosis on the left side with neurological deficit in the left leg.

Plan: In view of the unrelenting symptoms of pain, in the lower back with radiculopathy in the left leg causing neurological deficit, progressive shortening of her walking distance, and marked limitation of motion in her daily activities, she is now indicated for posterior spinal decompression and fusion at L5-S1 with interbody fusion so as to restore disc height and also foraminal decompression on the left side so as to improve the radiculopathy.

(Tr. 340.) Dr. Puri's radiology report dated May 3, 2010 read as follows: "X-rays of the lumbar spine done today in flexion and extension did reveal a collapsed disc at L5-S1 without any significant motion." (Tr. 342.)

On June 14, 2010, Dr. Puri noted that Plaintiff continued to have persistent low back pain with radiation to the left leg and that her condition remained unchanged.  (Tr. 328.)  He also noted that Plaintiff was scheduled for spinal fusion surgery on July 9, 2010 and that she was allergic to Vicodin. (*Id.*)

On July 9, 2010 Plaintiff was admitted to St. Mary Medical Center where Dr. Puri performed spinal decompression and fusion of the lumbar spine at L5-S1.  (Tr. 254.)  Plaintiff was discharged on July 12, 2010 with the following discharge diagnoses: status post spinal decompression and fusion, L5-S1, and status post repair of incidental durotomy.[10]  (*Id.*)  On discharge, Dr. Puri noted that Plaintiff "was doing very well," she "was ambulating with the left leg quite well," and was "walking with the help of a walker."  (*Id.*)  Dr. Puri also noted there was no reported pain in the left leg and there was no headache.  (*Id.*)

On July 26, 2010, Plaintiff presented to Dr. Puri for a follow-up, status post spinal fusion and reported she was doing better.  (Tr. 326.)  Dr. Puri noted the wound was well-healed and diagnosed Plaintiff with status/post spinal fusion, prescribed physical therapy, and ordered that she remain off work.  (*Id.*)  On September 9, 2010, Dr. Puri noted Plaintiff was two months

---

[10] Plaintiff suffered an incidental dural tear and leakage of cerebral spinal fluid (CFS) during surgery.  (Tr. 254.)

status post lumbar fusion, but she still had residual pain with pain in left leg and that physical therapy had not been authorized yet. (Tr. 324.) Dr. Puri found Plaintiff had limited range of motion and stated that she needed physical therapy as soon as possible ("2 months post [operation] [and] no [physical therapy] yet!"), and pain medication. (*Id.*) Plaintiff was also to remain off work. (*See id.*; *see also* Tr. 321.)

In an evaluation completed on September 9, 2010, Dr. Puri also made the following observations:

> Today, I evaluated this 55-year-old pleasant female who had undergone posterior spinal decompression and fusion surgery at [the] L5-S1 level on July 9, 2010 for a work-related injury. She had done well from a surg[ical] point of view. She is followed up today in the office and she continues to have residual low back pain with some radicular symptoms in the left leg.
>
> On examination, she was found to have well-healed wound over the lumbar spine. She had marked weakness of the muscles in the lumbar spine and had limited range of motion due to stiffness. There was mildly positive root tension sign in the left lower extremity.
>
> Diagnosis: Two months status post lumbar fusion, L5-S1.
>
> Recommendations: She was advised [to start] physical therapy . . . at least four weeks after surgery. However, despite our repeated attempts, the physical therapy has not been approved by the workman comp[ensation] office. It is imperative that this patient, with a major spine surgery, should not go without physical therapy for so long. She does require physical therapy to the lumbar spine in the form of range of motion exercises and muscle strengthening. . . .

25

(Tr. 322.)  Plaintiff began physical therapy on September 16, 2010 and
reported using a bone stimulator.  (Tr. 318.)  She also reported that "her back
[felt] very good" but had "some pain in the left part [illegible]" and had
radiating pain to the left foot.  (*Id.*)  She ambulated with a left foot drop.  (*Id.*)
Plaintiff participated in physical therapy until October 20, 2010, when she
reported that her back was "feeling and moving much better" and that she
was "happy with the progress she has made."  (*See* Tr. 303; *see also* Tr. 304-
309, 311-20.)

On October 11, 2010, Dr. Puri noted Plaintiff's status remained
unchanged and that she continued to have residual pain in the lower back
with radiation to the left leg, started and would continue with physical
therapy, and would continue on medication.  (*Id.*)  Plaintiff was to remain off
work.  (*Id.*)  On October 27, 2010, Dr. Puri observed Plaintiff continued to
have residual low back pain but physical therapy helped.  (Tr. 302.)  Dr. Puri
found Plaintiff had limited range of motion in the lumbosacral spine and
positive straight leg raises at 60 degrees bilaterally.  (*Id.*)  Plaintiff's
treatment plan included home physical therapy, vocational rehabilitation,
and medication.  (*Id.*)  Dr. Puri changed Plaintiff's work status to "modified
duty," beginning October 28, 2010.  (*Id.*)

On October 27, 2010, Dr. Puri also completed a Primary Treating
Physician's Permanent and Stationary Report (PR-4).  (Tr. 295-300.)  Dr. Puri

26

reported that Plaintiff had been treated with medication, physical therapy, injections, and had arthroscopic surgery of the left shoulder on January 14, 2010, and lumbar spinal fusion at L5-S1 on July 9, 2010. (Tr. 296.) Dr. Puri found Plaintiff had good range of motion in the left shoulder and neck but limited range of motion with residual pain in the lumbosacral spine. (*Id.*) He diagnosed cervical strain, impingement syndrome of the left shoulder, and DDD at L5-S1 with radiculopathy. (*Id.*) Dr. Puri attributed a 23% whole person impairment rating due to lumbar spine DRE (diagnosis-related estimate) (*see id.*), and opined that Plaintiff's permanent disability was directly caused by an injury arising in the course of her employment (Tr. 298). In terms of future medical treatment, Dr. Puri opined Plaintiff would often need medications and requested vocational therapy. (Tr. 299.)

Dr. Puri also opined that Plaintiff could occasionally lift and/or carry up to 20 pounds; stand and/or walk a total of less than 8 hours per 8-hour day; sit for a total of less than 8 hours per 8-hour day; and push/pull up to 20 pounds. (*Id.*) Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching, crawling, twisting, and to frequent reaching, handling, fingering, feeling, seeing, hearing, and speaking. (Tr. 300.) Dr. Puri also found Plaintiff was limited to (1) driving only one hour and then requiring a 15-minute break; (2) sitting for one hour and then requiring a 15-minute break; (3) low stress jobs; (4) no heavy lifting; and (5) no repetitive

bending/stooping.  (*Id.*)  He also found Plaintiff was restricted from all
environmental hazards (*e.g.*, heights, machinery, temperature extremes,
dust, fumes, humidity, vibration, *etc.*).  (*Id.*)  Dr. Puri also opined that
Plaintiff could return to her usual occupation but with the "above
restrictions."  (*Id.*)

A Revised Work Injury Status Report prepared by Dr. Puri's office also
dated October 27, 2010 indicated that Plaintiff was released to modified work
as of October 28, 2010 and that vocational rehabilitation was requested.  (Tr.
293.)  Plaintiff's restrictions were listed as: "[n]o driving over 45 min[utes],
sitting for 45 min[utes] then a break for 10 min[utes], no lifting over 10
[pounds], low stress job[s], [and] no standing more than 45 min[utes]."  (*Id.*)

Plaintiff returned to Dr. Puri on June 12, 2013.  (Tr. 404.)  Dr. Puri
noted that Plaintiff had done well initially after the lumbar spinal surgery
but "later on the symptoms of pain came back in the lower back with
radiation of pain going all the way down the left leg" and that her symptoms
had been worsening lately.  (*Id.*)  Plaintiff also complained of persistent pain
in the neck, with pain radiating into the left upper extremity causing
numbness in the fingers of the left hand, and pain in both shoulders, worse
on the right.  (*Id.*)  On physical examination, Dr. Puri found Plaintiff had
limited range of motion in the terminal one-third in all directions.  (*Id.*)
Neurological "exam of the upper extremities revealed decreased reflexes on

the left side and numbness in the C6 and C7 dermatomes of the hand." (*Id.*)

Upon examination, "the lumbar spine revealed local tenderness over the

lumbar region with limited motion" and that Plaintiff had "a positive root

tension sign in the left lower extremity." (*Id.*)  Plaintiff also exhibited

hypoactive reflexes on the left side and there was numbness in the L5

dermatome of the left foot.  (*Id.*)  Dr. Puri's diagnoses were: (1) severe

degenerative disc disease from C4 to C7; (2) tendinitis in both shoulders; and

(3) failed back syndrome of the lumbar spine with radicular symptoms in the

left leg with possible screw impingement on the left side at S1.  (*Id.*)  Dr. Puri

referred Plaintiff for MRIs of the cervical and lumbar spine, prescribed

Motrin, Neurontin, Norco, and Lunesta, and directed Plaintiff to return

within three weeks for further evaluation.  (*Id.*)

Dr. Puri's June 12, 2013 Radiology Report indicated that X-rays of the

cervical spine revealed marked narrowing of the disc spaces with

degeneration at C4-5, C5-6, and C6-7.  (Tr. 405.)  X-rays of the lumbar spine

revealed previous solid fusion at L5-S1 with intact screws, but the left-sided

S1 screw appeared slightly longer compared to the right-sided screw.  (*Id.*)

An MRI of the lumbar spine without contrast dated June 30, 2013, and

compared with an MRI dated April 14, 2010, revealed post-surgical changes

consistent with posterior lumbar interbody fusion at L5-S1 with pedicle screw

fixation bilaterally at L5 and S1 and a trace disc bulge at L4-L5 which was

new compared to the prior MRI, with the spinal canal and neural foramina patent.  (Tr. 406.)

An MRI of the cervical spine dated June 30, 2013 revealed the following:

> 1.    C4-C5: Moderate-to-severe disc height loss with a 2 mm disc osteophyte complex but the spinal canal and neural foramina are patent.  There is slight indentation of the thecal sac.
> 2.    C5-C6: Mild-to-moderate [disc height] loss with a 2 mm disc osteophyte complex.  The spinal canal is mildly stenotic.  The right neural foramen in patent.  There is mild-to-moderate left neural foraminal stenosis.  There is slight indentation of the thecal sac.
> 3.    C6-C7: Mild-to-moderate disc height loss with a 2 mm disc osteophyte complex.  The spinal canal is mildly stenotic.  The neural foramina are patent.

(Tr. 408-09.)

On July 13, 2013, Dr. Puri again examined Plaintiff and noted her neck pain level was 9-10/10 and her lumbar spine and leg pain level was 8/10.  (Tr. 403.)  His findings on examination were consistent with those from the previous visit.  (*Id.*)  Dr. Puri assessed: (1) severe DDD at C4-5, C5-6, C6-7 with radicular pain in the left arm with a neurological deficit; and (2) failed back syndrome of the lumbar spine with radicular pain in the left leg.  (*Id.*)  Dr. Puri opined Plaintiff was a candidate for anterior cervical discectomy and fusion surgery at C4-5, C5-6, C6-7 and recommended Plaintiff continue physical therapy on her own and take pain medication for her lumbar spine symptoms.  (*Id.*)  He also noted Plaintiff had not returned to work since

spinal surgery and, "with her neck symptoms getting worse," he opined she was "not likely to return to any kind of gainful employment for at least 12 months." (*Id.*) Dr. Puri also opined Plaintiff should be considered for disability "in light of her extensive spine involvement in both the cervical spine and [the] lumbar spine and the need for further surgery on the cervical spine." (*Id.*)

On September 4, 2013, Dr. Puri again examined Plaintiff noting that she complained of persistent pain in her neck with radiation down both upper extremities causing numbness in her fingers. (Tr. 402.) Plaintiff reported having these symptoms over the previous several months despite conservative treatment. (*Id.*) Dr. Puri noted that the cervical symptoms started spontaneously several months prior without any history of trauma and X-rays and MRIs confirmed severe DDD from C4 to C7. (*Id.*) The physical examination revealed tenderness, limited range of motion in all directions, hypoactive bilateral upper extremity reflexes along with numbness in the C6 and C7 dermatomes in both hands, and weakness in the grip strength of both hands. (*Id.*) Dr. Puri noted Plaintiff had already been indicated for anterior cervical discectomy and fusion from C4 to C7. (*Id.*)

On November 20, 2013, Plaintiff again presented to Dr. Puri complaining of pain in the neck with headaches and radiation into the upper extremities. (Tr. 670.) On examination, Dr. Puri noted no change in his

clinical findings and noted Plaintiff was "waiting for the insurance to sort [itself] out before" going through with surgery and would continue to take pain medication, including Neurontin in the meantime.  (*Id.*)  On January 29, 2014, Plaintiff returned to Dr. Puri complaining of persistent pain in the cervical spine, exhibiting painful range of motion in the cervical spine on examination and radicular symptoms in both upper extremities causing numbness.  (Tr. 669.)

On March 18, 2014, Dr. Puri completed a Spinal Impairment Questionnaire.  (Tr. 413-19.)  Dr. Puri diagnosed Plaintiff with failed back syndrome of the lumbar spine and severe DDD of the cervical spine at C4-5, C6-7, and C7-8.  (Tr. 413.)  He pointed to X-rays and MRIs of the cervical and lumbar spine in support of his diagnoses.  (*Id.*)  Dr. Puri also identified the following clinical findings in support of his diagnoses: limited range of motion and tenderness in the cervical and lumbar spine; muscle spasm in the neck and lower back; sensory loss at the C6 and C7 dermatomes of both hand and L5 dermatome of both feet; reflex changes; muscle atrophy in the cervical and lumbar spine; muscle weakness in both hands and legs; trigger points and swelling with muscle spasms in the cervical and lumbar spine; crepitus in the cervical spine on range of motion; positive sitting straight leg raise testing on the left and right at 60 degrees;  positive supine straight leg raise testing on the left and right at 40 degrees; and abnormal gait with limping due to pain

32

in the legs.  (Tr. 413-14.)  Dr. Puri opined that Plaintiff experienced severe and constant pain in the neck with radiation to arms and lumbar pain with radiation to legs and that activities of daily living like walking, bending, stooping, or lifting precipitated or aggravated Plaintiff's pain.  (Tr. 415.)

        In terms of Plaintiff's limitations, Dr. Puri opined that she could sit for two hours and stand/walk for two hours total in an 8-hour workday, but she had to avoid continuous sitting, and had to get up every 30 minutes from a seated position and wait 10-15 minutes before returning to the seated position.  (Tr. 416.)  It was also medically necessary for Plaintiff to elevate her legs to waist level every 30 minutes for 10-15 minutes.  (*Id.*)  Dr. Puri also opined that Plaintiff could occasionally lift and/or carry up to five pounds; it was medically recommended that she use a single-point cane; and her ability to ambulate effectively was restricted.  (Tr. 416-17.)  Plaintiff also had significant limitations in reaching, handling, or fingering; and she could occasionally grasp, turn, and twist objects, use hands/fingers for fine manipulations, and use arms for reaching, including overhead.  (Tr. 417.)  Dr. Puri also opined Plaintiff's symptoms would increase in a competitive work environment and she would frequently experience pain or other symptoms severe enough to interfere with her concentration.  (Tr. 418.)  Plaintiff would require unscheduled beaks of 30 minutes every one to two hours.  (*Id.*)  Dr. Puri further opined that Plaintiff's symptoms were expected to last at least

12 months, she was not a malingerer, she would be absent from work due to her impairments or treatment more than three times a month, and the limitations assessed in the Questionnaire applied as far back as August 12, 2008.[11]  (Tr. 418-19.)  In a treatment noted dated August 11, 2014, Dr. Puri also opined that Plaintiff would likely require lumbar spine surgery in the future for her failed back syndrome.  (Tr. 671.)

### 3.  Lee B. Silver, M.D., F.A.C.S.

On July 2, 2009, Dr. Silver, a Qualified Medical Evaluator ("Q.M.E."), completed a Panel Qualified Medical Evaluation of Plaintiff.  (Tr. 270-78.) Dr. Silver summarized Plaintiff's complaints, in part, as follows:

> [Plaintiff] . . . notes she was injured at work on August 11, 2008, when she was walking and stepped on a loose piece of cement and fell, hitting her head with loss of consciousness and sustaining injury [to] the cervical spine, the lumbosacral spine, the left shoulder, the left upper extremity, the left hip, the left foot, and the left lower extremity.  . . .

> Ms. Buford describes a constant pain in the cervical spine radiating to the right hand with constant pain in the left shoulder and left upper extremity that are increased by ADL's [activities of daily living] [sic] and decreased by medication. There is numbness over the radial aspect of the right forearm extending to involve the entire aspects of the right hand.  There is numbness throughout the entire aspect[] of the left upper extremity.  Ms. Buford has constant pain in the lumbosacral spine, the left hip, the left foot, and both lower extremities that are increased by ADL's [sic] and decreased with medication.

---

[11] Dr. Puri restated these opinions in a letter dated August 20, 2014.  (Tr. 667-68.)  Of note, Dr. Puri continued to treat and evaluate Plaintiff well after the relevant period at issue; however, those records are not summarized here.

> There is numbness over the lateral aspect of the left lower
> extremity extending to the dorsum of the foot.  There are no right
> lower extremity sensory changes.  Ms. Buford has headaches and
> dizziness.  . . .

(Tr. 271.)

Upon physical examination, Dr. Silver found that Plaintiff's neck

exhibited "diffuse tenderness with slight paravertebral spasm, guarding, and

asymmetric loss of range of motion."  (Tr. 272.)  Cervical range of motion was

30 degrees with flexion and 20 degrees with extension; "right and left lateral

rotation was 50/30 degrees"; and "right and left lateral bending was 20/20

degrees."  (*Id.*)  Dr. Silver made the following relevant findings upon

examination:

> There was diffuse thoracic and lumbosacral tenderness with [a]
> slight paravertebral spasm, guarding, and asymmetric loss of
> range of motion.  The supine straight leg raise examination on
> the right at 50 degrees created tightness with a negative Lasegue
> maneuver on the left at 30 degrees create[ing] pain in the
> lumbosacral spine and left buttock with a negative Lasegue
> maneuver.
>
> Lumbar range of motion, flexion: Fingertips lack 17 inches from
> the floor, extension [at] 15 degrees, and right/left lateral bending
> [at] 15/15 degrees.
> . . .
> The Tinel examination over the left posterior tibial nerve created
> numbness over the medial aspect of the left ankle and heel.
> There was no lower extremity swelling.  There was diffuse
> tenderness throughout the left lower extremity as well as over
> the right ankle and right foot without other right lower extremity
> tenderness.

(Tr. 272-73.)

Dr. Silver diagnosed Plaintiff with left shoulder impingement and MRI evidence of tendinosis/partial tear of the supraspinatus tendon with moderate hypertrophic degenerative changes of the AC joint; cervical musculoligamentous strain/sprain; rule out carpal tunnel syndrome; left elbow sprain; left upper extremity contusion/strain/sprain; lumbosacral musculoligamentous strain/sprain; left hip contusion/sprain; left lower extremity contusion/sprain/strain; and right shoulder sprain with possible internal derangement.  (Tr. 275-76.)  Dr. Silver also opined that Plaintiff's "described mechanism of injury [was] consistent with the sustaining of the present orthopedic condition" and that he did "not detect any inconsistencies in that regard."  (Tr. 276.)  Dr. Silver also found that there appeared "to be objective findings present to balance with at least some of the subjective complaints" and that "there [was] industrial causation present."  (*Id.*)  He further observed that Plaintiff had received conservative treatment, however, she remained symptomatic and there were significant subjective complaints as to the left shoulder and "objective findings despite an adequate trial of conservative care."  (*Id.*)

Dr. Silver noted positive MRI findings and opined that Plaintiff was a candidate for surgical intervention of the left shoulder and that further evaluation and/or treatment was indicated as she had not yet reached maximum medical improvement.  (*Id.*)  Dr. Silver also opined that Plaintiff

could work with restrictions, including no lifting greater than ten pounds, no repetitive activities such as bending, stooping, or cervical spine movements, and no repetitive work with the left upper extremity above the shoulder level. (Tr. 277.)

### 4.  Ralph Steiger, M.D., Examining Orthopedist

On March 9, 2015, Dr. Steiger examined Plaintiff and completed an Orthopedic Evaluation (Tr. 11-26) and a Spinal Impairment Questionnaire (Tr. 676-81.)  Plaintiff complained that she experienced excruciating pain in her neck daily (10/10 pain level) which radiated into her left arm with limited range of motion and numbness, bilateral shoulder pain with limited range of motion, and constant lower back pain (10/10 pain level) with shooting pain into her left leg to her toes with numbness and tingling.  (Tr. 12.)  Dr. Steiger noted various positive findings on examination, including: tenderness and limited range of motion in the cervical spine; positive impingement and crank test in the bilateral shoulders; tenderness and pain in the bilateral carpometacarpal joints/wrists, positive Finkelstein's test bilaterally, and Tinel's tests on the left; limited range of motion and tenderness in the lumbar spine; a slow, deliberate, broad-based antalgic gait; difficulty with heel-to-toe walking; difficulty climbing on and off the examination table; involuntary muscle spasms in the paralumbar muscles; a positive straight leg raising test in the supine position at 20 degrees on the right and at 12 degrees on the left;

a positive straight leg raising test in the sitting position at 75 degrees on the right and at 70 degrees on the left; and a positive Lasegue's test for sciatic nerve root pressure/pain.  (Tr. 15-19.)

Dr. Steiger noted Plaintiff experienced significant difficulties with activities of daily living and ambulation due to her orthopedic condition.  (Tr. 24.)  Dr. Steiger further opined, *inter alia*, as follows:

> In regard to her limitations of activities, the patient has restrictions of no repetitive or prolonged neck movement; no repetitive work at or above [the] shoulder level; no repetitive gripping, grasping, pinching, [and] fine manipulation; no typing, keyboarding, data entry, or writing more than 25% of a workday; no heavy lifting, pushing, or pulling; no repeated bending or stooping; no repetitive twisting; no prolonged sitting and no prolonged standing or walking.

(Tr.25.)  Based on these limitations of activities, Dr. Steiger found that Plaintiff was unable to perform full-time competitive work, and her disability had lasted at least 12 months and was expected to continue indefinitely.  (*Id.*)  He also opined that Plaintiff's symptoms and related limitations applied as far back as August 11, 2008.  (Tr. 681.)

### 5. Payam Moazzaz, M.D., State Agency Consultative Examiner

On April 14, 2013, Dr. Moazzaz prepared a summary report following a complete orthopedic consultation at the request of the State agency.[12]  (Tr.

---

[12] In preparing this report, Dr. Moazzaz reviewed only the operative report dated July 9, 2010 and the MRI of the lumbar spine dated April 14, 2010.  (Tr. 374.)

394-98.)  On examination, Dr. Moazzaz observed Plaintiff ambulated with a decreased cadence and velocity, and had difficulty with heel walking, toe walking, and squatting.  (Tr. 395.)  He observed a normal range of motion in the cervical spine, upper extremities, and lower extremities, but limited thoracolumbar range of motion.  (Tr. 396.)  Dr. Moazzaz found negative straight leg raising tests in the seated and supine positions bilaterally.  (*Id.*)  He also found normal grip strength, motor strength, sensation, and reflexes. (Tr. 397.)  According to Dr. Moazzaz, X-rays of the lumbar spine "demonstrate pedicle screw instrumentation at L5-S1" and "no sign of implant complication or loosening."  (*Id.*)  He diagnosed Plaintiff with status post L5-S1 spinal fusion with residual symptoms.  (*Id.*)   Dr. Moazzaz found Plaintiff had the following functional limitations: lifting and carrying limited to 20 pounds occasionally and 10 pounds frequently; standing and walking limited to six hours in an eight-hour workday; sitting limited to six hours in an eight-hour workday with normal breaks; occasional performance of postural activities; unrestricted overhead activities and full use of the hands for fine/gross manipulation; and no need for an assistive ambulatory device.  (Tr. 398.)

## C.   The ALJ's July 17, 2019 Decision

At step two of the five-step sequential evaluation process,[13] the ALJ

---

[13] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

found that Plaintiff had the following severe impairments: disorders of the spine status post surgery; left shoulder strain with impingement status post surgery; and obesity.  (Tr. 706.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 707.)

The ALJ then found that "prior to April 1, 2013, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)," but with the following limitations:

> [Plaintiff can] lift[] up to 20 pounds occasionally and lift[]/carry[] up to 10 pounds frequently; stand[]/walk[] for about 6 hours and sit[] for up to 6 hours in an 8-hour workday with normal breaks. She can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs, and can occasionally balance, stoop, kneel, crouch, and crawl.  Overhead reaching, bilaterally, is limited to no more than occasionally.  She must avoid all exposure to hazards such as the use of moving machinery and exposure to unprotected heights.

(Tr. 707.)  In determining Plaintiff's RFC, the ALJ stated that he "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 [C.F.R.] [§] 404.1529 and SSR 16-3p." (*Id.*)  The ALJ also stated that he considered the "opinion evidence in accordance with the requirements of 20 [C.F.R.] [§] 404.1527." (*Id.*)

In discussing Plaintiff's subjective complaints, the ALJ summarized her hearing testimony as follows:

> The claimant testified that she stopped working in August 2008 following a fall at work that resulted in injuries to her left shoulder and lower back, [and] each required surgical repair in 2010. Despite [having] surgery, she indicated that she continued [sic] in pain and felt as though a surgical screw was hitting her sciatic nerve. She stated that she had difficulty raising her left arm and grabbing and holding things in her left hand. She said she was in excruciating pain and was unable to sit[,] stand, walk, or be active for long periods. She estimated that she could sit [for] only 15-30 minutes, stand [for] only 20 minutes, and walk [for] only 5-10 minutes at one time. She reported that she did some light household chores, such as dusting, laundry, and starting easy dinners, and could drive short distances to the grocery store. She recalled needing help bathing/dressing, and said that much of her time was spent reading, resting, or lying down. She reported taking 2-3 naps daily, up to 3 hours each, and stated that prescribed medication caused excess sleep as well as nausea. She reported limited ability to socialize with family and friends.

(Tr. 708.) The ALJ then stated that while Plaintiff had "work-related limitations associated with her severe impairments," those limitations had been "accounted for in the residual functional capacity by restricting the claimant to light exertional work and providing additional postural, manipulative[,] and environmental limitations." (*Id.*) However, the ALJ found that "the objective medical evidence [did] not support the need for further limitations prior to the established onset date." (*Id.*)

The ALJ then referred to the objective medical evidence and imaging results, noting in part that Plaintiff initially received conservative treatment, but then required shoulder and lumbar surgeries, as follows:

> Having failed conservative treatment measures, the claimant underwent arthroscopic subacromial decompression surgery of the left shoulder on January 19, 2010 [], followed by physical therapy with noted improvement.  By June 2010, discharge from physical therapy for the left shoulder was recommended as the claimant demonstrated 5/5 strength and range of motion was reportedly within normal limits.  The claimant reported that her shoulder was feeling and moving well [].  [The] October 2010 medical records indicate good range of motion of the left shoulder [}), and subsequent [X]-rays of the bilateral shoulders[] performed in June 2013 were normal [].

(Tr. 708-09.)

The ALJ also noted:

> While physical therapy records from early 2010 showed improvement in the claimant's shoulder condition and function, they also document complaints of waxing/waning back pain. While the claimant related "unbearable" back pain at times [], she stated that her back was "behaving" at other visits [].  Repeat imaging of the lumbar spine, performed [on] April 14, 2010, showed disc height loss and disc desiccation at the L5-S1 level with diffuse annular disc bulge and bilateral facet arthropathy with mild bilateral neural foraminal narrowing.  The central canal and lateral recesses were patent [].  A lumbar spine [X]-ray done on May 30, 2010 showed a collapsed disc at L5-S1 without any significant motion [].  Upon physical examination, Dr. Puri noted marked limitation of motion of the lumbar spine, positive root tension sign in the left lower extremity, hypoactive reflexes of the left side and decreased sensation in the S1 dermatome of the left foot [].

(Tr. 709.)  The ALJ observed that Plaintiff "underwent posterior spinal

decompression and fusion at L5-S1 on July 9, 2010" which was followed by a

"course of physical therapy." (*Id.*) According to the ALJ,

> The claimant reportedly did well from a surgical view, but with
> some residual low back pain radiating to the left lower extremity
> [].  Discharge from physical therapy with a home exercise
> program for back pain was recommended on October 20, 2010.
> The claimant reported that her back was feeling and moving
> much better, and said that she was happy with the progress she
> made.  The claimant's range of motion was noted to be within
> normal limits [].

(*Id.*)

> The ALJ also observed as follows:

> While numerous temporary disability status forms were
> completed by Dr. Puri in 2009-2010 [], the claimant was released
> to modified duty on October 27, 2010 [].  Some discrepancies were
> noted in the multiple forms/reports created by Dr. Puri on
> October 27, 2010.  For example, on one report Dr. Puri indicated
> that the claimant was restricted to no driving over 45 minutes,
> sitting for 45 minutes then [a] break for 10 minutes, no lifting
> over 10 pounds, low stress job[s], and no standing [for] more than
> 45 minutes [].  On the same date, he completed another form that
> indicated the claimant could lift/carry and push/pull 20 pounds,
> stand/walk/sit each less than 8 hours per 8-hour day, and
> occasionally climb, balance, stoop, kneel, crouch, crawl, and twist,
> and frequently reach, handle, finger, feel, see, hear, and speak.
> Further, he noted the claimant could drive two hours and then
> break for 15 minutes, and sit one hour and then break for 15
> minutes. . . .

(*Id.*)

The ALJ then pointed to a "significant gap in [the] medical treatment

in 2011 and 2012, with no indication of continuity of medical care." (*Id.*)  The

ALJ added that, "[d]espite the apparent absence of regular medical follow-up

in 2011-2012, the record does not document that the claimant sought or required emergency department care for symptom control or crisis intervention." (*Id.*) The ALJ also noted that Plaintiff did not allege she "was unable to seek medical care, and [did] not provided evidence that she was denied medical treatment from either her treating sources or from indigent care facilities." (*Id.*) Therefore, given Plaintiff's "documented positive response to treatments in 2008-2010, and lapse of regular medical follow-up in 2011-2012," the ALJ deduced that "the record suggests satisfactory symptom control and management consistent with Dr. Puri's release to modified duty in October 2010." (*Id.*)

The ALJ further reasoned that "prior to the established onset date, healthcare providers did not document disabling clinical findings or observations, and diagnostic studies failed to reveal evidence of disease significant enough to preclude all work activity." (Tr. 710.) The ALJ also found that Plaintiff's treatment was "generally successful" in managing her symptoms. (*Id.*) The ALJ acknowledged Plaintiff required surgery in her left shoulder and lumbar spine, but he noted that "the evidence reflect[ed] subsequent progressive and uncomplicated recovery periods, with good functional outcomes following routine post-surgical physical therapy." (*Id.*) The ALJ further reasoned that "[t]he record [did] not reflect that any physician felt the claimant's degree of pain or functional limitations

warranted more aggressive treatment such as significant interventional pain management services." (*Id.*) As to Plaintiff's testimony of nausea and excessive sleep caused by prescription medication, the ALJ found these complaints were not documented in the treatment records which, according to the ALJ, "suggest[ed] that, if present, they were not severe or persistent enough to warrant discussion with her doctors and, therefore, would not interfere with the claimant's ability to perform work activities in any significant manner." (*Id.*)

The ALJ further found that while Plaintiff had subjective complaints of "aches and pains of the musculoskeletal system, objective testing did not reveal disabling abnormalities, and physical examinations and observations did not reveal significant and persistent functional limitations beyond those allowed for in the [RFC] described above." (*Id.*) Thus, the ALJ found that Plaintiff "generally had functional range of motion, normal strength, no evidence of muscle wasting, and no annotation of significant motor, sensory, or reflex deficits." (*Id.*) The ALJ also found that Plaintiff "remained capable of living independently within her household, adequately tending to her personal care needs with some assistance at times, preparing at least simple meals, performing light household chores, driving significant distances, shopping, attending medical appointments, maintaining relationships and socializing with others, and reading." (*Id.*)

Thus, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (*Id.*) However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not fully supported prior to April 1, 2013, for the reasons explained in this decision." (*Id.*) The ALJ further found that Plaintiff's "functional abilities prior to the established onset date were consistent with an ability to perform a reduced range of light exertional work as specified within the above [RFC]." (*Id.*)

Next, the ALJ found that "beginning on April 1, 2013," Plaintiff had the same RFC to perform light work as previously noted, but added that Plaintiff was "limited to occupations with a sit/stand option defined as allowing a person to sit or stand, alternatively, at will provided a person is within employer tolerances for off task behavior." (Tr. 711.) According to the ALJ, "beginning on April 1, 2013, the claimant's allegations regarding her symptoms and limitations [were] consistent with the evidence and support[ed] the need for a sit/stand option to address the claimant's symptoms associated with her severe impairments, as well as obesity." (*Id.*)

The ALJ noted that Plaintiff presented to Dr. Mozzaz for a consultative examination on April 14, 2013 and summarized his findings and opinion. (*Id.*) The ALJ also noted that Plaintiff returned to Dr. Puri in June 2013 and

that while he noted Plaintiff had initially done well after the lumbar spine surgery, "symptoms of pain in the lower back with radiation down the left leg had returned and recently worsened."  (*Id.*)  The ALJ added that Plaintiff complained of "neck pain with radiation into the left upper extremity causing numbness in the fingers of the left hand, as well as bilateral shoulder pain." (*Id.*)  The ALJ noted worsening symptoms as well as subsequent MRIs and X-rays showing Plaintiff's deterioration, and that "Dr. Puri opined functional limitations associated with the claimant's impairments [] would preclude competitive work []."  (*Id.*)

In analyzing the opinion evidence, the ALJ noted that that the State agency medical consultants opined that Plaintiff could perform a range of light exertional work.  (Tr. 711.)  The ALJ explained that such opinion was not "inconsistent with the claimant's history of treatment, positive response to treatment, uncomplicated recovery from shoulder and lumbar spine surgery, positive response to therapy, abnormalities demonstrated on musculoskeletal imaging studies, results of normal electrodiagnostic testing of the lower extremities, and clinical observations and results of physical examinations that failed to identify more substantial functional limitations prior to the established onset date."  (Tr. 711-12.)  The ALJ also noted that the State agency medical consultants did not examine Plaintiff, but their findings were "generally consistent with the medical record available at the

47

time of the State agency reviews." (Tr. 712.)  The ALJ then gave great weight to the opinions of the State agency medical consultants for the period prior to April 1, 2013.  (*Id*.)  However, for the period after April 1, 2013 (*i.e.*, the "established onset date"), the ALJ accorded little weight to the State agency medical consultants' opinions because the "hearing level evidence, including the updated medical records, suggest[ed] that a sit/stand option [was] warranted to address the claimant's impairments of greater severity, increased symptoms with accompanying surgical recommendations, and the claimant's obesity during this period."  (*Id*.)

Then, for the period prior to April 1, 2013, the ALJ accorded little weight to the 2008 opinion of Dr. Yu that Plaintiff could not tolerate prolonged driving/sitting.  (*Id*.)  The ALJ reasoned that Plaintiff's ability to tolerate a 94-mile round trip driving distance while seeing Dr. Yu and her "subsequent temporary restrictions and course of treatment prior to the established onset date," were inconsistent "with the opined severity of the restrictions."  (*Id*.)  Nevertheless, the ALJ accorded great weight to this opinion "as of the established onset date as it [was] consistent with subsequent medical records and objective findings as of this date."  (*Id*.)  The ALJ also gave little weight to the opinions of Dr. Silver, who indicated "temporary partial disability" because his opinions predated the left shoulder and lumbar spine surgeries, "while subsequent records indicate[d] the

claimant experience[ed] a positive response to treatment with good functional

outcomes."  (*Id.*)

Next, the ALJ accorded partial weight to the opinions of Dr. Puri, and

explained as follows:

> As noted above, the temporary restrictions [provided in 2009-
> 2010] were provided prior to the completion of the noted
> reparative surgeries and subsequent positive response to physical
> therapy with good functional outcomes.  Further, . . .
> inconsistencies were noted in the restrictions given by Dr. Puri
> regarding the claimant's limitations when released to modified
> duty in October 2010.  For the period prior to April 1, 2013, the
> undersigned finds the overall evidence supports the claimant's
> ability to perform a reduced range of light exertional work as
> described in the above [RFC], which is not substantially
> inconsistent with Dr. Puri's restrictions at Exhibit 3F/18-20, with
> the primary difference being Dr. Puri's opinion of the claimant's
> ability to sit for only one hour before taking a 15[-]minute break.
> However, the undersigned notes that, in the same opinion, Dr.
> Puri stated that the claimant could drive for two hours.  As such,
> little weight is given to the work-preclusive restrictions
> provide[d] by Dr. Puri prior to April 1, 2013, as internally
> inconsistent, and inconsistent with the overall evidence and good
> response to treatment during this period.

(*Id.*)

However, for the period after the established onset date of April 1,

2013, the ALJ accorded the opinions of Dr. Puri significant weight and found

them to be "generally consistent with the evidence of record."  (*Id.*)

Specifically, the ALJ noted that "this [was] supported by the worsening of

symptoms related to Dr. Puri upon the claimant's return to treatment in

June 2013" and also was "consistent with [the] updated objective diagnostic

imaging studies of musculoskeletal abnormalities, including recently identified severe cervical spine impairment and possible lumbar spine surgery, warranting the need for a sit/stand option as of April 1, 2013, which ha[d] been included in the assessed [RFC] during this period." (*Id.*)  The ALJ also found that the "work-preclusive opinions for the period since the established onset date [were] consistent with the documented abnormalities identified on physical examination [], Dr. Puri's diagnosis of failed back syndrome [], and the consultative examiner's diagnosis of status post L5-S1 spinal fusion with residual symptoms []."  (Tr. 712-13.)

The ALJ also accorded partial weight to the "functional limitations" opined by the consultative examiner, Dr. Moazzaz, that Plaintiff had the capacity to perform a range of light exertional work.  (Tr. 713.)  The ALJ explained: "While this is not inconsistent with the course of treatment and objective findings associated with the claimant's chronic degenerative conditions, this did not consider the cervical spine abnormalities identified on subsequent radiology studies, possible need for lumbar surgery, and the associated worsening of symptoms reported."  (*Id.*)  As such, the ALJ found it appropriate to accord greater weight to the opinions of Dr. Yu and Dr. Puri "on the issue of a sit/stand option as of the established onset date."  (*Id.*)

Next, the ALJ gave partial weight to the more recent opinions of Dr. Steiger and Dr. DePaz.  (*Id.*)  According to the ALJ, these "opinions

describe[d] work-preclusive restrictions and appear[ed] largely based upon examinations performed years after the claimant's date last insured." (*Id.*) The ALJ also explained that "[t]he opinions regarding the need for a sit/stand option [were] also consistent with Dr. Puri's opinions, and appear[ed] consistent with the diagnosis from the April 2013 consultative examination diagnosing status post L5-S1 spinal fusion with residual symptoms and the overall evidence as of the established onset []." (*Id.*) As such, the ALJ explained, "a sit/stand option ha[d] been included within the [RFC] to address these opinions, as well as consistent objective and medical findings as of the established onset date." (*Id.*) In sum, the ALJ concluded that the RFC was consistent with the "greater weight of the longitudinal medical and overall evidence as of the established onset date." (*Id.*)

Then, at step four, based on the testimony of the vocational expert ("VE"), the ALJ found that prior to April 1, 2013, Plaintiff was capable of performing her past relevant work as a credit analyst, teller, and collections clerk. (*Id.*) Beginning April 1, 2013, the ALJ determined that Plaintiff's RFC prevented her from being able to perform her past relevant work. (Tr. 714.) The ALJ also found Plaintiff was an individual of advanced age on April 1, 2013, had at least a high school education, was able communicate in English, and did not have transferrable work-skills. (*Id.*) Thus, the ALJ found that, considering Plaintiff's age, education, RFC, and the VE's testimony, there

were no jobs existing in significant numbers in the national economy that
Plaintiff could have performed prior to April 1, 2013. (*Id.*) As such, the ALJ
found that Plaintiff was not disabled prior to April 1, 2013, but "became
disabled on that date and has continued to be disabled through the date of
th[e] decision." (Tr. 715.)

### D.   Analysis

The Court agrees with Plaintiff that the ALJ's statements for
discrediting Plaintiff's subjective complaints are unsupported by substantial
evidence. Although the ALJ found that Plaintiff's medically determinable
impairments could reasonably be expected to cause her alleged symptoms,
the ALJ concluded that her "statements concerning the intensity,
persistence[,] and limiting effects of these symptoms [were] not fully
supported prior to April 1, 2013." (Tr. 710.) According to the ALJ, Plaintiff's
"functional abilities prior to the established onset date were consistent with
the ability to perform a reduced range of light exertional work as specified" in
the RFC. (*Id.*) Specifically, the ALJ found that Plaintiff's treatment was
"generally successful" in managing her symptoms, that despite requiring
arthroscopic shoulder surgery and a lumbar fusion, the evidence showed
"progressive and uncomplicated recovery periods, with good functional
outcomes following routine post-surgical physical therapy." (*Id.*) The ALJ
also noted that the record did not reflect that any physician opined that

52

Plaintiff's "degree of pain or functional limitations warranted more aggressive treatment such as significant interventional pain management." (*Id.*)  The ALJ also rejected Plaintiff's statements that prescription medication caused excessive sleep and nausea, stating that "these complaints were not documented in the treatment records" and suggested that these effects were not severe or persistent and "would not interfere" with her ability to work.  (*Id.*)

The ALJ also reasoned that although Plaintiff complained of "aches and pains of the musculoskeletal system, objective testing did not reveal disabling abnormalities, and physical examinations and observations did not reveal significant and persistent functional limitations beyond those allowed for in the [RFC]." (*Id.*)  The ALJ further found that Plaintiff had "functional range of motion, normal strength, no evidence of muscle wasting, and no annotation of significant motor, sensory, or reflex deficits." (*Id.*)  In rejecting her subjective complaints, the ALJ also pointed to her ability to live independently within her household, tend to her personal care needs with some assistance at times, prepare simple meals, perform light household chores, drive significant distances, shop, attend medical appointments, maintain relationships and socialize with others, and read.  (*Id.*)

First, contrary to the ALJ's findings, Plaintiff's surgeries, particularly her lumbar fusion, did not result in "progressive" or "uncomplicated recovery

53

periods, with good functional outcomes," as evidenced primarily by Plaintiff's 2013 diagnosis of failed back syndrome and imaging showing a pedicle "screw impingement at S1 level on the S1 nerve," for which a second lumbar spine surgery was recommended.[14]  (*See, e.g.*, Tr. 10, 413, 671, 674.)  Also, a significant portion of the medical record during the relevant period documents that Plaintiff had reduced/limited range of motion, including in the lumbar spine, and related muscle weakness.  (*See, e.g.*, Tr. 322-24 (noting, on September 9, 2010, that Plaintiff had "marked weakness of the muscles in the lumbar spine and had limited range of motion due to stiffness"); *see also* Tr. 272-73 (finding, on July 2, 2009, asymmetric loss of range of motion in the cervical, thoracic, and lumbar spine); Tr. 343 (noting, on May 3, 2010, Plaintiff exhibited diminished range of motion in the lumbar spine); Tr. 413-14, 475, 516-17 (same).)  According to Dr. Puri, although Plaintiff initially responded well to the lumbar fusion, at a follow-up appointment on September 9, 2010, Plaintiff continued "to have residual low back pain with some radicular symptoms in the left leg."  (*See* Tr. 322; *see also* Tr. 302, 310 (same observations on October 11 and October 27, 2010).)  Even after

---

[14] *See Lingenfelser v. Comm'r of Soc. Sec.*, No. 6:16-cv-921-Orl-DCI, 2017 WL 4286546, at *7 (M.D. Fla. Sept. 27, 2017) ("When determining whether a claimant is disabled, an ALJ should consider evidence postdating an individual's date of last insured as it may be relevant so long as it bears 'upon the severity of the claimant's condition before the expiration of his or her insured status.'").

releasing Plaintiff to modified duty on October 27, 2010, and after she completed physical therapy, Dr. Puri nevertheless noted that Plaintiff had limited range of motion in the lumbosacral spine with residual pain.  (*See* Tr. 296.)  Therefore, the ALJ's finding that Plaintiff had a "functional range of motion" is unsupported by the record.[15]

Furthermore, contrary to the ALJ's finding that "objective testing did not reveal disabling abnormalities, and physical examinations and observations did not reveal significant and persistent functional limitations," the record evidence reveals the opposite.  Here, the record shows that Plaintiff's treating and examining sources consistently observed positive findings prior to April 1, 2013, showing Plaintiff had significantly reduced range of motion in the cervical and lumbar spine, positive straight leg raise testing, radiculopathy, tenderness to palpitation in the cervical and lumbar spine, reduced sensation in the feet, legs, and arms, decreased strength in the legs and arms, abnormal gait, and difficulty ambulating.  (*See* Tr. 271-76, 299-383, 424-534.)  The record also supports Plaintiff's consistent complaints of pain with sitting, an inability to remain in the same position for prolonged periods, and a need to alternate between sitting and standing/moving.  (*See,*

---

[15] The record also contains multiple findings of weakness of the muscles in the lumbar spine, upper and lower extremities, and hands.  (*See, e.g.*, Tr. 17, 322, 402.)

*e.g.*, Tr. 470 (noting Plaintiff was unable to sit for more than ten minutes without pain and required a change of position for relief); *see also* Tr. 468, 509, 518, 526.)  The record also consistently documented that Plaintiff's symptoms were aggravated by activity, prolonged sitting or standing, walking, bending, driving and riding in a car, and lying flat on her back.[16] (Tr. 20, 24, 300, 468-70, 509, 518, 526.)

These examination findings and Plaintiff's reported symptoms and limitations were consistent with the MRI and X-ray results evidencing status post spinal fusion surgery at L5-S1, severe degenerative disc disease of the lumbar spine and the cervical spine, and failed back syndrome. (*See* Tr. 343 (noting, on May 3, 2010, that X-rays showed collapsed disc space at L5-S1 with foraminal stenosis on the left side); Tr. 405 (noting that a radiology report dated June 12, 2013, indicated X-rays of the cervical spine revealed marked narrowing of the disc spaces with degeneration at C4-C7 and X-rays of the lumbar spine revealed a previous solid fusion at L5-S1, but the left-sided screw appeared slightly longer than the right one); Tr. 406 (noting that an MRI report of the lumbar spine dated June 30, 2010, revealed, *inter alia*, a trace disc bulge at L4-L5); Tr. 408-09 (noting that an MRI of the cervical

---

[16] On March 9, 2015, Dr. Steiger observed: "Of note, the patient indicates that she experiences too much pain lying down without support; therefore, [lower extremity] measurements were taken with the patient in a seated position."  (Tr. 20.)

spine dated June 30, 2013, showed, *inter alia*, a moderate-to-severe disc height loss at C4-C5 with a 2 mm disc osteophyte complex, a mild-to-moderate disc height loss at C5-C6 with a 2mm disc osteophyte complex with mild-to-moderate left neural foraminal stenosis, and a mild-to-moderate disc height loss at C6-C7 with a 2mm disc osteophyte complex and that the "spinal canal is mildly stenotic").)  Thus, the evidence of record, including the objective findings and the opinions of Plaintiff's treating physicians, tends to support Plaintiff's subjective complaints.  *See Meek v. Astrue*, No. 3:08-cv-317-J-HTS, 2008 WL 4328227, at *1 (M.D. Fla. Sept. 17, 2008) ("Although an ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision . . . .  Rather, the judge must explain why significant probative evidence has been rejected.") (internal citations omitted); *Lord v. Apfel*, 114 F. Supp. 2d 3, 13 (D.N.H. 2000) (stating that although the Commissioner is not required to refer to every piece of evidence in his decision, the Commissioner may not ignore relevant evidence, particularly when it supports the claimant's position).

Also, in considering an individual's treatment history, an adjudicator may consider, *inter alia*, that a medical source may have advised the individual that there is no further effective treatment, that the individual may have structured her activities to minimize symptoms to a tolerable level by avoiding physical activities that aggravate her symptoms, and/or that the

individual may not agree to take prescription medications because the effects are less tolerable than the symptoms.  SSR 16-3p.  Here, Plaintiff specifically testified that she could not tolerate prescription pain medication well as it caused dizziness, lightheadedness, and "knock[ed] her out."  (Tr. 77-78, 737.)  Of note, there are numerous treatment notes documenting Plaintiff's allergy to Vicodin and some indications of an intolerance to pain medication.[17]  (*See, e.g.*, Tr. 626 (listing Plaintiff's allergy to Vicodin and noting an allergy band had been applied upon admission for spinal surgery on July 9, 2010); *see also* Tr. 328, 559, 597.)

Although the ALJ points to a gap in the treatment records between 2011 and 2013, Plaintiff applied for DIB benefits in August of 2012 based on her *continued* symptoms of pain in the cervical and lumbar spine, including "unbearable shooting pains" in her lower back, sciatic nerve pain in her lower back with numbness and swelling in her left leg and foot, and stating that she could not sit or stand for a long time.  (Tr. 92.)  Additionally, contrary to the ALJ's conclusion that there appeared to be no explanation for Plaintiff's lack of treatment during this time due to lack of insurance or financial

---

[17] After her lumbar fusion surgery in July 2010, Plaintiff refused pain medication and requested Motrin and Ibuprofen instead, and there was a post-operative note documenting nausea from prescribed medication.  (*See, e.g.*, Tr. 648-49 (post-operative notes dated July 10, 2010 indicating that after the lumbar fusion, Plaintiff complained, "[y]ou guys have been giving me so much medication[,] that's all you do," and that she had nausea and required anti-nausea medication).)

means, Plaintiff testified that she was unable to go forward with cervical spine surgery, albeit in 2013, because "the workers [compensation] ran out," presumably after she was released to modified duty in October of 2010, and she explained, "it took [them] two years to do my lumbar [spine surgery] and also my shoulder [surgery]."[18]  (*See* Tr. 751; *see also* Tr. 670 (noting on November 20, 2013, that Plaintiff was "waiting for the insurance to sort [itself] out before" going through with surgery).)

Moreover, the Court notes that it was improper for the ALJ to conclude that Plaintiff's limited participation in certain daily activities, including household chores, was consistent with the ability to perform competitive work.  The performance of limited daily activities is not necessarily inconsistent with allegations of disability.  *See, e.g.*, *Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (per curiam) (reversing and remanding the case to the Commissioner for lack of substantial evidence to support the finding that the claimant had no severe impairment, even though the claimant testified that she performed housework for herself and her husband, accomplished other light duties in the home, and "was able to read, watch television, embroider, attend church, and drive an automobile short

---

[18] It is established that a claimant's inability to afford treatment excuses her failure to pursue treatment and/or non-compliance with prescribed treatment.  *See* *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam).

distances"); *White v. Barnhart*, 340 F. Supp. 2d 1283, 1286 (N.D. Ala. 2004) (holding that substantial evidence did not support the decision denying disability benefits, even though the claimant reported that she took care of her own personal hygiene, cooked, did housework with breaks, helped her daughter with homework, visited her mother, socialized with friends sometimes, and, on a good day, drove her husband to and from work, but needed help with grocery shopping, and could sit, stand, or walk for short periods of time). Instead, the record shows that Plaintiff's activities of daily living were rather limited.

Here, the ALJ failed to provide adequate reasons, consistent with and supported by the evidence, for rejecting Plaintiff's testimony regarding the limiting effects of her complaints of pain, adverse reactions to pain medication, and aggravating and alleviating factors, including the need to constantly adjust her position. The ALJ's failure to provide reasons supported by substantial evidence for discounting Plaintiff's testimony prevents the Court from determining whether the ALJ properly evaluated Plaintiff's symptoms, and thus, her RFC. *See* SSR 16-3p. ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, *be consistent with and supported by the evidence*, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's

symptoms.") (emphasis added); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  When "an ALJ discredits a claimant's testimony, the ALJ must articulate, explicitly and adequately, reasons for not crediting the testimony." *Gray v. Comm'r of Soc. Sec.*, No. 8:17-cv-1157-T-JSS, 2018 WL 3805866, at *6 (M.D. Fla. Aug. 10, 2018) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223-24 (11th Cir. 1991)).  "'Implicit in this rule is the requirement that such articulation of reasons . . . be supported by substantial evidence.'" *Gray*, 2018 WL 3805866, at *6 (quoting *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987)).

Based on the foregoing, the ALJ's reasons for discounting Plaintiff's complaints of pain and related symptoms prior to April 1, 2013, and the limiting effects of these symptoms in assessing the RFC, are not supported by substantial evidence.  In light of this conclusion and the possible change in the RFC assessment for the relevant period, it is unnecessary to address Plaintiff's remaining argument.  *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, No. 8:06-cv-1839-T-EAJ, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam).

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** to the ALJ with instructions to: (a) reconsider Plaintiff's subjective complaints; (b) re-evaluate Plaintiff's RFC assessment, if necessary; and (c) conduct any further proceedings deemed appropriate.

2.     The Clerk of Court shall enter judgment accordingly, terminate any other pending motions, and close the file.  Because of the length of time Plaintiff's case has already taken and the severity of her impairments, the Commissioner is directed to expedite the review of Plaintiff's claim.

3.     Notwithstanding the closure of the file, counsel for the Commissioner is directed to file a status report advising of the progress of Plaintiff's claim in the administrative process, with the first status report due on **July 1, 2022**, and subsequent reports due **every 60 days** thereafter.

4.     The judgment should state that if Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any § 406(b) or § 1383(d)(2) fee application must be filed within the parameters set forth by the Standing Order on Management of Social Security Cases entered in *In re: Administrative Orders of the Chief Judge*, Case No.: 3:21-mc-1-TJC (M.D. Fla. Dec. 7, 2021).

**DONE AND ORDERED** at Jacksonville, Florida, on March 31, 2022.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record